IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 8:21CR246 |
| Plaintiff, | |
| vs. | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR VARIANCE AND MEMORANDUM IN AID OF SENTENCING |
| OLIVER J. GLASS, | |
| Defendant. | |

COMES NOW the United States of America, by and through Steven A. Russell, United States Attorney, and Sean P. Lynch, Assistant United States Attorney, and submits its memorandum in aid of sentencing.

*"The prosecutor has more control over life, liberty and reputation than any other person in America. His discretion is tremendous. He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled and unveiled intimidations. Or the prosecutor may choose a more subtle course and simply have a citizen's friends interviewed….. While the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst."*

    -Robert H. Jackson, Attorney General, *The Federal Prosecutor: An Address at The Second Annual Conference of United States Attorneys (April 1, 1940)*[1].

Oliver Glass (hereinafter "Glass), comes before this Court for sentencing on account of his acting in malice and with base motives while abusing his power of office as the Dodge County Attorney to conspire to deprive a romantic rival of his rights. A 12-month-term of incarceration to be followed by a one-year term of supervised release is appropriate in this matter.

---

[1] https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf

1

The United States will organize this memorandum by briefly reciting the relevant the procedural history of the case, provide the factual background, discuss the advisory guideline calculation, and will then address the 3553(a) sentencing factors while simultaneously addressing Glass's Motion for Variance.

I.     PROCEDURAL HISTORY

On September 24, 2021, the grand jury indicted Glass, on two counts of Cyberstalking in violation of 18 U.S.C. § 2261A. On November 21, 2022, Glass plead guilty to an Information admitting to Conspiring to Deprive Rights Under Color of Law in violation of 18 U.S.C. §§ 371 and 242. A Presentence Investigation was ordered.

On January 23, 2023, United States Probation and Pretrial Services (hereinafter "U.S. Probation") produced the Presentence Report. On January 31, 2023, Glass filed an Adoption of the Presentence Report. Filing 42. On January 31, 2023, Glass filed a Motion for Variance along with an accompanying Brief and exhibits in support thereof. Filings 44, 45, and 46. On February 8, 2023, U.S. Probation filed a Revised Presentence Investigation Report.[2]

II.     FACTUAL BACKGROUND

The United States asserts the following which is the same in substance as the prosecution version of the offense provided to U.S. Probation[3]:

---

[2] This version of the PSR is correcting an error in ¶ 47 regarding which the case number for which Glass was serving a term of probation when he committed the instant offense. This correction does not change the guideline calculation.
[3] As noted by U.S. Probation "the discovery file accurately reflects the government's version of the offense." PSR ¶ 30.

Oliver J. Glass was the elected County Attorney of Dodge County. He was first appointed in 2011, was elected in 2014, and re-elected in 2018. In March 2021, Glass resigned following convictions for DUI, a probation violation, and the allegations involved in this investigation.

Glass married Katie Glass in 2009. On November 16, 2018, Katie Glass filed a Complaint for Legal Separation from Glass in Dodge County. In October 2019, Katie Glass met Victim 1, and they began dating in December 2019. On January 3, 2019, Katie Glass filed an Amended Complaint for Dissolution of Marriage.

On March 6, 2020, Glass learned from Victim 1's employer that Victim 1 was dating Katie Glass. Victim 1 worked as a delivery driver for an office supply company and one of the customers on his route was the Dodge County Attorney's Office (hereinafter "DCAO"). There are no reports that Victim 1 and Glass ever interacted while Victim 1 was delivering to the DCAO. Victim 1 was terminated from his employment on March 6. The employer's purported reason for contacting Glass was that he was worried about Victim 1's mental state and Victim 1 being around Glass's kids.

As part of Glass's employment as the Dodge County Attorney, he had access to the Nebraska Criminal Justice Information System (NCJIS). NCJIS is an Internet-based, law enforcement database that Nebraska criminal justice professionals can utilize in their official capacities to search for and view criminal justice and personal information of individuals who reside in, are employed in, or have criminal histories in the state of Nebraska. NCJIS is limited to official law enforcement purposes, pursuant to the rules and regulations of the state of Nebraska and the Nebraska Crime Commission. Between January 1, 2020 and March 5, 2020, Glass had not successfully accessed NCJIS. There were a few attempts to access, but Glass did not appear to know his login information. Within minutes of completing his call with Victim 1's former

employer, Glass logged in to NCJIS and looked up Victim 1. Glass also made calls to several law enforcement officers discussing Victim 1 and they then researched Victim 1 on NCJIS. In a text message conversation, on March 6, 2020, Glass admitted to pulling Victim 1's criminal history and acknowledged that it was information that members of the public would not be able to access. Beginning on March 6, 2020, Glass and two other employees of the Dodge County Attorney's Office acting at Glass's direction, used their official credentials to access the NCJIS database and view information related to Victim 1, including vehicle registration data and other personal information. This was done on approximately 15 different occasions.

On March 11, 2020, and into March 12, 2020, Glass transmitted multiple Facebook and iMessage communications to Victim 1, which contained intimidating and threatening language. In these messages Glass refers to Victim 1 as "faggot," "pussy," "stupid bitch," and "slightly retarted [sic]." These text messages included references regarding Victim 1's residence and car that Glass obtained from NCJIS. Specifically:

- "I love 'yo' reminds me of Jesse from breaking bad, great movie, especially when Jesse blows Walts head off, because he's just had enough of the game. Such a silky game…."
- "Oh hey buddy, one last rhing [sic], I've taken Katie all over the world in our marriage, but I run heavy bud, news for you, yo."
- "We could meet up, Subway? Let me know bro, I could walk there from work, and you could walk there from your dilapidated white trash apartment."
- "I hope it doesn't rain. Just watched [sic] my truck. I know you don't want you [sic] Monte Carlo to get spoiled."

As a result of this behavior, Victim 1 experienced significant emotional distress. In a phone call to his parents that morning, Victim 1 made statements about killing himself which prompted them to contact law enforcement. Victim 1 was hospitalized pursuant to an Emergency Protective Custody, which would have originated through Glass's office. Victim 1 was hospitalized beyond the 72

hours from March 12, 2020, through March 17, 2020. The special prosecutor that was appointed for the prospective mental health commitment case stated the delay was due to his being appointed.

Following Glass texting Victim 1 on March 11 and March 12, 2020, Glass texted Katie Glass on March 13, 2020, "I am extremely sorry for my sins the last couple days and the chaos I have created. I will do any thing you want to make it right. Please look at the big picture. Talk to your attorney. Don't send thing to the AG office, please God. I won't be able to pay child support if I lose everything."

Glass used the information that he and two of his employees had obtained from NCJIS to surveil Victim 1 and Katie Glass by driving by Victim 1's residence. Glass took photographs of Katie Glass's vehicle at Victim 1's residence. Glass would send text messages documenting his surveillance:

- -On March 9, 2020, Glass sent a text message to an employee of the Dodge County Attorney's Office: "Just drove by military on way home. Katie got off work at 3:00. Katie over at [Victim 1]'s house already."
- -On June 3, 2020, Glass sent a text message to an individual stating, "Drove by [Victim 1]'s apartment…Of course Katie's van is there."
- -On June 22, 2020, Glass sent the following text message to a law enforcement officer with the Nebraska State Patrol stating "[Victim 1] is back. His car is at his apt."

The FBI conducted surveillance of Glass during three separate time periods: July 27 through July 31, 2020; August 24 through August 28, 2020; and September 15 through September 18, 2020. FBI personnel observed Glass taking inefficient or indirect paths of travel in order to drive past Victim 1's residence. Glass would slow down while Katie Glass's residence was in view. There were photographs found on Glass's iCloud account of Katie Glass's van at Victim 1's apartment which are consistent with these paths of travel.

In late March to early April 2020, while Glass was in substance abuse treatment, he called an employee of the DCAO. Glass asked the DCAO employee to drive by Victim 1's and Katie Glass's residences for him and let him know if they were together. The DCAO employee also reported that Glass directed her to pull Victim 1's information from NCJIS for his use.

Between March 6, 2020 and on or about December 22, 2020, Glass conspired with other individuals who are unnamed in the Information to deprive Victim 1 of his rights protected by the Constitution, specifically, his right against unreasonable search and seizure protected by the 4th Amendment of the Constitution by conspiring to unlawfully stop or arrest Victim 1. Glass made a request to Sergeant 1 of the Fremont Police Department (hereinafter "FPD") about Victim 1 and possibly drinking and driving. As a result of Glass's, request, Sergeant 1 of the FPD disseminated information about Victim 1's vehicle to multiple officers at FPD to include issuing a "Be On the Look Out" (BOLO) and also in a pass along book used to brief each shift. Glass's request also caused Sergeant 1 of the FPD to look for Victim 1's vehicle "constantly" and Sergeant 1 of the FPD also followed Victim 1's vehicle on one occasion because of it. Sergeant 1 of the FPD passed this information to Sergeant 2 of the FPD. This caused Sergeant 2 of the FPD to drive past Victim 1's apartment to identify the vehicle so he could keep an eye out for it. Sergeant 3 of the FPD reported that Sergeant 1 of the FPD passed along this information to other FPD officers and that they should "watch for this guy." Sergeant 1 of the FPD also mentioned to the officers that Victim 1 was dating Glass's wife. Sergeant 3 of the FPD felt the need to instruct his officers not to "headhunt" after Sergeant 1 of the FPD left. On April 4, 2020, Glass, sent a text message to family members stating, "You guys were right. Katie wanted to get rid of the kids all weekend so she could spend the weekend with her boyfriend. **My cops just told me that my van is at his place**

6

**right now**. She is such pathetic white trash." (emphasis added). Glass had received a phone call from Sergeant 1 of the FPD approximately 10 minutes prior to sending this text message.

Glass, a command officer with the Hooper Police Department, and Sergeant 1 of the Dodge County Sheriff's Office would drive by Katie Glass's and Victim 1's respective residences without a legal justification or criminal predicate. When the command officer with the Hooper Police Department was not able to locate Victim 1, Glass sent a text message stating, "His car in Fremont last couple of days at his apt." On June 26, 2020, Glass sent the command officer with the Hooper Police Department a text message including license plate numbers and descriptions of vehicles of Victim 1 and Katie Glass. Specifically, "[Katie Glass's license plate number] is 5X-XXXX on a dark blue 2010 Chrysler town and country minivan. [Victim 1's license plate number] is 5X-XXXX on 03 Monte Carlo, white. I would like to know if [Katie Glass] is at [Victim 1's] address…." Glass then provided Katie Glass's address to the command officer with the Hooper Police Department. The command officer with the Hooper Police Department also used his position in law enforcement to obtain non-public images of a child victim from Victim 1's child abuse conviction in Iowa. These images were found in Glass's Apple iCloud with the earliest appearance date of July 13, 2020. The investigation showed that these images are not available absent a law enforcement request.

Glass made additional attempts to conspire with law enforcement to deprive Victim 1 of his rights. In a phone conversation with Sergeant 1 of the Dodge County Sheriff's Office, Glass made statements that if he could arrest Katie Glass or Victim 1 that it would be of benefit to Glass. Glass also told Sergeant 1 of the Dodge County Sheriff's Office that he should watch for Victim 1 because Victim 1 drinks during the day. Glass told Sergeant 1 of the Dodge County Sheriff's Office that if Katie Glass or Victim 1 could be arrested for a DUI that it would benefit Glass. Glass

7

told the law enforcement officer that he trusted the shift that Sergeant 1 of the Dodge County Sheriff's Office supervised and that Sergeant 1 of the Dodge County Sheriff's Office could share his request with the other officers on the shift. Sergeant 1 of the Dodge County Sheriff's Office and Glass have been friends since middle school. Additionally, in late spring to early summer 2020, Glass requested that a command officer of the Fremont Police Department to have the local drug task force, comprised of the Fremont Police Department, Saunders County Sheriff's Department, and the Dodge County Sheriff's Department, initiate a narcotics investigation into Victim 1. A Dodge County Sheriff representative and another employee of the DCAO were present for this meeting, but claim to not recall this request.

Glass also made comments to law enforcement officers about killing Victim 1 and Katie Glass. on May 27, 2020, Glass sent text messages to a trooper with the Nebraska State Patrol, "God help me I may fucking kill this guy," and "I am so mad right now I could kill them both." Multiple law enforcement officers reported that they believed Glass may harm Katie Glass and/or Victim 1.

### III.  GUIDELINE CALCULATION

Glass has filed an adoption of the PSR and is not contesting U.S. Probation's calculation of the advisory guideline range. The PSR establishes Glass's advisory guideline range as follows:

| | | |
|---|---|---|
| USSG § 2X1.1(a) | Base Offense Level[4] | <u>18</u> |
| | Adjusted Offense Level | 18 |
| USSG § 3E1.1(a) | Acceptance of Responsibility | -2 |

---

[4] As this is a conspiracy in violation of 18 U.S.C. § 371, USSG § 2X1.1(a) provides that the base offense level is the "base offense level from the guideline for the substantive offense plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." As such, the base offense level was calculated as follows:
    2H1.1(a)(2)         Base Offense Level   12
    2H1.1(b)(1)(A)   Public Official        +6
PSR ¶ 32.

| | | |
|---|---|---|
| USSG § 3E1.1(b) | Acceptance of Responsibility | -1 |
| | Total Offense Level | 15 |

PSR ¶ 32-41.

Glass was determined to be a Criminal History Category III. PSR ¶ 48. Glass was assessed one criminal history point for a DUI conviction occurring on August 17, 2020 in Dodge County, Nebraska in case number CR20-545. PSR ¶ 44. He was also assessed one criminal history point for a DUI-2nd Offense conviction occurring on May 3, 2021 in Dodge County, Nebraska in case number CR21-537. PSR ¶ 45. Glass was assessed two additional criminal history points pursuant to USSG § 4A1.1(d) for committing the instant offense while on probation. PSR ¶ 47.

As a result of this calculation, Glass's advisory guideline range would have been 24 to 30 months. However, because his offense of conviction is a misdemeanor his advisory guideline range is 12 months pursuant to USSG § 5G1.1(a).

## IV. 18 U.S.C. § 3553(a) FACTORS

A sentence of 12 months' imprisonment is sufficient, but not greater than necessary to serve the § 3553(a) factors that this Court is required to consider. A 12-month sentence is the advisory guideline sentence and is the statutory maximum penalty. A 12-month sentence adequately addresses the nature and circumstances of the offense as well as Glass's history and characteristics. Additionally, a 12-month sentence promotes respect for the law and serves the sentencing purpose of both specific and general deterrence. A sentence is substantively unreasonable if it "does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment balancing sentencing factors." *United States v. Moore*, 565 F.3d 435, 438 (8th Cir. 2009).

9

Post-*Booker*, the court must determine whether a non-Guidelines sentence is appropriate after determining the Guidelines range and any permissible departures within the Guidelines structure. *United States v. Myers*, 503 F.3d 676, 684 (8th Cir. 2007). The court has a "responsibility to select a sentence that [is] 'sufficient, but not greater than necessary' to comply with the statutory sentencing purposes." *United States v. Gray*, 577 F.3d 947, 950 (8th Cir. 2009) (quoting 18 U.S.C. § 3553(a)). "[A] district court's job is not to impose a reasonable sentence, but rather to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a). *United States v. Lytle*, 336 F. App'x 587, 588 (8th Cir. 2009).

Departures are appropriate if the sentencing court finds that there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." U.S.S.G. §5K2.0. The guidelines provide that

> sentencing courts [are] to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, a court may consider whether a departure is warranted.

U.S.S.G. Ch. 1, Pt. A(4)(b). However, the Eighth Circuit has said "an extraordinary reduction must be supported by extraordinary circumstances." *United States v. Dalton*, 404 F.3d 1029, 1033 (8th Cir. 2005) (discussing a § 5K1.1 departure).

In order to comply with 18 U.S.C. § 3553(a)(2), this Court must impose a sentence sufficient, but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the

10

defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(1) & (2). In determining the sentence, this Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant.

Glass asserts various grounds that he claims warrant a variance. Glass claims that a variance is warranted because 1) the offense was a non-violent misdemeanor; 2) the conduct was aberrant; 3) the conduct occurred over a limited time, during which he was abusing alcohol and in circumstances unlikely to reoccur; and 4) that Glass is unlikely to recidivate and has already suffered from collateral consequence to deter future criminal conduct. The United States notes due to the statutory maximum, Glass is already essentially receiving a variance from the advisory guideline range. Aside from the statutory constraint, the United States disputes that there any grounds for a variance in this matter. The United States will address Glass's asserted grounds while addressing the § 3553(a) factors.

The nature and circumstances of the offense and the history and characteristics of Glass both justify a 12-month sentence of incarceration. At the heart of this case is Glass attempting to use the power of his public office to advance his personal vendetta against his estranged wife's new romantic partner. Glass was the Dodge County Attorney for approximately 10 years. Despite Glass's attempts to describe his job performance as "outstanding," it was anything but. As detailed by a member of the judiciary, Glass's role as Dodge County Attorney was fraught with issues of substance abuse, perceived ethical violations, assaultive behavior, and dereliction of duties that eroded the public trust in the judicial and legal system. *See* Exhibit 1. Glass was known to often comment or joke that he was "the most powerful" person or law enforcement in the county. *See*

11

Exhibit 1, p. 8-9; Exhibit 2, p. 5. Glass also commented that he was "untouchable" by law enforcement. *See* Exhibit 3, p. 5.

In his filing, Glass attacks Victim 1 based on his criminal record. However, it is poignant to contrast Victim 1's treatment by law enforcement to that of Glass. For example, Victim 1 was arrested for driving under the influence and was booked into the Dodge County jail. When Glass was arrested for driving under the influence, sheriff deputies helped facilitate him withdrawing bail money from an ATM to post bond, drove his vehicle to his house, and did not charge him for the concealed weapon that he had without a permit.[5]

Throughout Glass's brief in support of a variance, he maligns the character of Victim 1 and attempts to cast his own actions as those of a concerned father. While Victim 1 does have a child abuse conviction and criminal history, it does not appear that this was Glass's motivation for his actions. There are countless text messages that reflect Glass's motivation was less about the children and more about his wife moving on from their relationship. *See* Exhibit 9, line 163; Exhibit 10, line 63; Exhibit 11, lines 59 and 110. Similarly, those around him often commented to Glass that his alleged concerns and hatred towards Victim 1 and his estranged wife occurred when the children were not even with them. *See* Exhibit 9, lines 244-247; Exhibit 10, lines 409-411. Glass also ignores the public safety risk he posed with his drunk driving that often occurred with his own children in his vehicle. As one law enforcement member who was interviewed observed, Glass has put his own children in far more danger than Victim 1 ever has. *See* Exhibit 3, p. 6.

---

[5] This refers to an occasion when Glass was actually arrested for driving under the influence. There are numerous reports about Glass being driven home once found driving intoxicated or law enforcement simply not responding. *See* Exhibit 3; Exhibit 4.

It is extremely difficult to believe that Glass, a trained attorney and a prosecutor with nearly 15 years of experience at the time of the events in question, lacked the knowledge to address any concerns about his children's welfare legally and without abusing his elected office. Nor does it appear that Glass contacted Child Protective Services about his concerns during 2020. Glass did make a report on January 28, 2021, about Victim 1 being around his children which resulted in "no evidence to substantiate abuse or neglect." Exhibit 5. Additionally, Glass did not go to similar extremes in response to one of his children expressing concerns about being around a different adult. *See* Exhibit 12, line 63-101, 103-112. Furthermore, there is no justification for Glass's behavior in attempting to target Victim 1 simply on the basis that Victim 1 has a criminal background and Glass believes him to be a bad person. This case is not about Glass's concerns for his children. Instead, it is about his personal animosity and abuse of power towards Victim 1 for engaging in a romantic relationship with Glass's estranged wife.

Glass's history and characteristics also warrant a 12-month sentence. Glass attempts to mitigate his conduct by emphasizing these events occurred while he was battling addiction. As is provided in the guidelines, "Drug or alcohol dependence or abuse ordinarily is not a reason for downward departure. Substance abuse is highly correlated to an increased propensity to commit crime." USSG § 5H1.4. Glass has previously violated a term of probation on his DUI conviction in CR 20-545 by incurring an additional driving under the influence offense. *See* PSR ¶ 44 and 45. It is also notable that most of the events in this matter occurred while Glass was receiving treatment and on probation. *See* PSR ¶ 23, 47, and 59.

A statutory maximum sentence, which would be a guideline sentence, would serve as general deterrence to other public officials and members of law enforcement from engaging in similar behavior. "Congress specifically made general deterrence an appropriate consideration

13

under section 3553(a)(2)(B), and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)). The misuse of NCJIS by members of law enforcement and the Dodge County Attorney's Office was significant. Similarly, there were members of law enforcement who were assisting Glass in researching, following, or disseminating information about Victim 1 to unwitting members of law enforcement. Glass asserts that the likelihood he will "engage in similar conduct in the future is nil." Filing 45, p. 22. It is true that Glass did resign from office in March of 2021. Glass's bar license was temporarily suspended and remains suspended to this day. Exhibit 6; Exhibit 7. While the future of Glass's professional license is uncertain, it is notable that the current Dodge County Attorney would consider Glass for re-employment if reinstated and if his personal issues and substance abuse were addressed. PSR ¶ 62. While Glass should not hold public office in the future, there were concerns from members of Glass's office and Dodge County law enforcement who shared Victim 1's belief that he was in real physical danger from Glass. *See* Exhibit 8, p. 5. A 12-month sentence in this matter would serve the objectives for both general and specific deterrence.

Glass has admitted to conspiring with others to deprive Victim 1 of his rights under color of law. Specifically, Glass has admitted to the following:

> Between March 6, 2020, through on or about December 22, 2020, Glass conspired with other unnamed individuals to deprive Victim 1 of his rights protected by the Constitution, specifically, his right against unreasonable search and seizure protected by the 4th Amendment of the Constitution by conspiring to unlawfully stop or arrest Victim 1. Glass and others utilized their restricted access to the Nebraska Criminal Justice Information System (NCJIS) to obtain information about Victim 1. A supervisor in the Fremont Police Department advised other officers that Victim 1 was dating Glass's wife and to be on the lookout for Victim 1 and provided other officers with Victim 1's information, vehicle description, and license plate number. An officer within the Dodge County law enforcement community, while acting as a private investigator, used his law enforcement credentials to obtain access about Victim 1's criminal history that was not publicly

14

> available. Members of law enforcement in Dodge County would drive by Victim 1's apartment looking for Victim 1 without a legal justification or criminal predicate.

Filing 41. This course of conduct undermines respect for the law and the public confidence in the criminal justice system and occurred in a county which has already been the focus of alleged and admitted misconduct by those in positions of power within the criminal justice system.[6] The instant case involved the actions of many in the Dodge County law enforcement community acting knowingly and some unwittingly to further Glass's personal objectives while acting under the color of law. Glass has pointed to Victim 1's criminal convictions during Glass's course of conduct. Victim 1 has pled guilty and faced the legal consequences for his actions. However, the danger in Glass's behavior and what his motion for variance fails to address is that his conduct was not that he was encouraging law enforcement to discover a crime and look for the perpetrator. Rather, Glass had instructed them as to who he wanted to be the perpetrator and, in turn, was asking for officers to find a crime. This sort of weaponization of law enforcement and criminal investigations for personal benefit, which Glass has now admitted to, undermines the respect for the law and warrants a 12-month sentence.

In evaluating the 3553(a) factors, a 12-month sentence is appropriate, but not greater than necessary. It is a guideline sentence and promotes respect for the law.

---

[6] *See* https://fremonttribune.com/news/state-and-regional/crime-and-courts/dodge-county-judges-sudden-resignation-followed-relationship-with-meth-user/article_8b86b763-eb6a-5dff-9c96-ed7565db7384.html; https://www.washingtonpost.com/crime-law/2021/02/09/sheriffs-deputy-fraud-scheme/; https://nebraska.tv/news/local/ex-fremont-police-officer-found-guilty-again-of-sexually-assaulting-a-child-austin-williams-omaha.

V.   CONCLUSION

For the above-described reasons, the Court should sentence Glass to 12-months in prison. The guideline in this case is 12 months. A 12-month sentence is within the advisory guidelines and properly takes into account the sentencing factors under 18 U.S.C. § 3553.

        UNITED STATES OF AMERICA,

        Plaintiff

        STEVEN A. RUSSELL
        United States Attorney

By:   s/ Sean P. Lynch
        SEAN P. LYNCH
        Assistant U.S. Attorney
        1620 Dodge Street, Suite 1400
        Omaha, NE  68102-1506
        Tel:  (402) 661-3700
        Fax:  (402) 661-3084
        E-mail:  sean.lynch@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all registered participants. I also hereby certify that a copy of the same was served by regular mail, postage prepaid, to the following non-CM/ECF participants: NONE.

        s/ Sean P. Lynch
        Assistant U.S. Attorney